**UNITED STATES DISTRICT COURT FOR THE**
**DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 19-CR-100 (BAH)** |
| | ) | |
| | ) | |
| **NIMROD SHALOM,** | ) | |
| | ) | |
| | ) | **Chief Judge Beryl A. Howell** |
| **Defendant.** | ) | **Next Date:  June 3, 2022** |
| | ) | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**
**INDICTMENT FOR VIOLATION OF CONSTITUTIONAL RIGHT TO SPEEDY**
**TRIAL**

The United States of America, by and through its counsel, the United States Attorney for the District of Columbia, respectfully files this Opposition to the defendant's Motion to Dismiss the Indictment for Violation of Constitutional Right to Speedy Trial. The defendant alleges that the delay between the issuance of the arrest warrant in 2016 and his arrest in 2021 constitutes a violation of his Sixth Amendment right to a speedy trial. However, as discussed further below, the defendant's Sixth Amendment speedy trial right was triggered by the filing of the indictment in 2019 – *not* the issuance of the arrest warrant. Any alleged pre-indictment delay occurred within the applicable statute of limitation and therefore does not constitute a speedy trial violation. Furthermore, an analysis of the factors delineated by the Supreme Court in *Barker v. Wingo*, 407 U.S. 530 (1972), demonstrates that any post-indictment delay in this case did not violate the defendant's right to a speedy trial. As a result, the defendant's motion should be denied.

## BACKGROUND

On August 1, 2016, the defendant contacted an undercover law enforcement agent (UC) based in Washington, D.C., through the KIK messenger application. The defendant stated that he was sexually active with his 4-year-old daughter and, over the course of the conversation, sent the UC three images constituting child pornography, claiming that these images were of his daughter. The defendant told the UC that he did not live in the United States, and that "no one cares what you do" where he lives.

Through an emergency disclosure request to KIK, U.S. law enforcement learned that the defendant's KIK account was associated with two IP addresses in Israel. U.S. law enforcement provided the IP addresses to Israeli law enforcement, who, through further legal process, identified the defendant as the subscriber of the IP address.

On August 2, 2016, the defendant was detained by the Israeli National Police. The Israeli police determined that the defendant did not, in fact, have a 4-year-old daughter, nor did he have access to any other children; the child pornography images that he had distributed to the UC are believed to have been produced in Russia.

During his interview with Israeli police, the defendant admitted to sending child pornography over KIK the day prior to his detention. Israeli law enforcement examined the defendant's iPhone and determined that there were approximately 23 deleted images of child pornography on the iPhone, including the images that were sent to the UC. Forensic examination also revealed that the KIK application was deleted from the defendant's iPhone at approximately the same time as the Israeli police were knocking on his door. On August 6, 2016, Israeli law enforcement released the defendant while Israeli prosecutors considered whether to bring charges against him.

Contrary to the defendant's assertions in his Motion, the Israeli police's actions were not taken "at the behest of the United States government." (Def. Mot. at 2). As outlined above, the United States provided the defendant's KIK messages and associated IP addresses to Israel, but did not direct or participate in the Israeli police's subsequent investigation or further actions, nor did the United States request that the defendant be arrested. Nor has the defendant produced any evidence to the contrary. Rather, the United States, as it should, provided a foreign ally information related to a possible crime in its territory.

On or about August 16, 2016, the United States learned that the defendant had booked a plane ticket to California for August 19, 2016. Accordingly, the government promptly sought a federal arrest warrant for the defendant. On or about August 17, 2016, the lead Israeli investigator informed the U.S. case agent that the defendant had inquired as to whether he could travel to the United States to visit his mother. The Israeli investigator asked the U.S. case agent whether the defendant would be arrested if he traveled to the United States. The U.S. case agent informed the Israeli investigator that disclosure of the U.S. investigation to the defendant was left to the discretion of Israeli law enforcement. On August 19, 2016, this Court issued a federal arrest warrant for the defendant. However, the defendant did not board his August 19 flight to California.

In December 2017, Israel informed the United States that it would not pursue charges against the defendant. On March 14, 2019, the United States indicted the defendant on one count of Distribution of Child Pornography, in violation of 18 U.S.C. § 2252(a)(2), and one count of Production of Sexually Explicit Depictions of a Minor for Importation Into the United States, in violation of 18 U.S.C. §§ 981(a)(1)(C) and 2253. Over the course of its investigation, the United

States submitted two requests under its Mutual Legal Assistance Treaty (MLAT) with Israel for evidence and materials relating to the defendant's offenses.

Less than two weeks later, on March 23, 2019, the U.S. Attorney's Office sent a draft extradition request to the Department of Justice's Office of International Affairs (OIA). *See* Exh. 1 (Olson Declaration) ¶ 14. Over the course of the next few months, OIA and the U.S. Attorney's Office worked together to finalize the extradition package. *Id.* On or about July 30, 2019, the U.S. Attorney's Office sent the final extradition package to OIA. *Id.* ¶ 15. On or about August 2, 2019, OIA sent the extradition package to the U.S. Department of State. *Id.* ¶ 16. On or about September 6, 2019, after completing its own review process, the Department of State sent a cable to the U.S. Embassy in Jerusalem, requesting a diplomatic note for the extradition package. *Id.* On or about September 19, 2019, the Department of State notified OIA that the extradition package had been delivered to the Israeli authorities. *Id.* ¶ 17.

On or about December 12, 2019, an attorney with Israel's Department of International Affairs sought additional information concerning uncharged conduct by the defendant that occurred outside of the District of Columbia. *Id.* ¶ 18. Between December 2019 and June 2020, OIA and the U.S. Attorney's Office worked together to try to ascertain the information requested by Israel. *Id.* On or about June 12, 2020, OIA responded to Israel's inquiries. *Id.*

On April 19, 2021, Israel sought further information concerning the defendant's criminal history in the United States, including the specific facts related to the defendant's prior conviction for a sex offense in the state of California. *Id.* ¶ 19. Before the United States even responded, the defendant voluntarily returned to the United States on or about July 22, 2021, and was arrested on the 2016 federal arrest warrant when he landed in Los Angeles, California, on July 23, 2021. *Id.* ¶ 20.

After his presentment in the U.S. District Court for the Central District of California, the defendant had his initial appearance and arraignment before Magistrate Judge Meriweather in the U.S. District Court for the District of Columbia on August 26, 2021. The matter was subsequently assigned to this Court and, at a status hearing on September 10, 2021, the defendant agreed to exclude time under the Speedy Trial Act until the next date of November 12, 2021. The parties then agreed to two further continuances, with the defendant agreeing to exclude time under the Speedy Trial Act each time, until April 1, 2022. On that date, the defendant indicated, for the first time, his intention to raise a constitutional speedy trial objection; he subsequently filed the pending motion on April 8, 2022.

## ARGUMENT

**I.      The Defendant Incorrectly Asserts that his Sixth Amendment Right to a Speedy Trial Attached Upon the Issuance of the Arrest Warrant.**

The defendant claims that "the length of the delay between the date the government charged Mr. Shalom in this matter, August 19, 2016, and Mr. Shalom's initial appearance and arraignment before the Honorable Robin M. Meriweather on August 26, 2021" constitutes a violation of his Sixth Amendment speedy trial right. *See* Def. Mot. At 4. However, the fundamental premise of the defendant's argument – that his constitutional speedy trial right attached when the arrest warrant was issued on August 19, 2016 – is incorrect and fails to cite operative case law in the Circuit. It is well-established that an individual's Sixth Amendment speedy trial right attaches when there is either "a formal indictment or information or else the actual restraints imposed by arrest and holding to answer a criminal charge." *United States v. Marion*, 404 U.S. 307, 313-20 (1971); *see also United States v. Loud Hawk*, 474 U.S. 302, 310-11 (1986) (affirming *Marion*'s holding that "when no indictment is outstanding, only the *actual* restraints imposed by arrest and holding to

answer a criminal charge…engage the particular speedy trial provision of the Sixth Amendment");

*United States v. Tchibassa*, 452 F.3d 918, 922 (D.C. Cir. 2006) ("[e]xcessive delay in prosecuting

a defendant *after he is indicted or arrested* violates this Sixth Amendment right") (emphasis

added); *United States v. Kilroy*, 769 F. Supp. 6, 7 (D.D.C. 1991), *aff'd,* 27 F.3d 679 (D.C. Cir.

1994) ("the Sixth Amendment right to a speedy trial does not begin to run for a criminal suspect

not in custody until indictment"). Thus, in the present case, the defendant's Sixth Amendment

speedy trial right attached upon his indictment on March 14, 2019, not upon the issuance of the

arrest warrant in 2016.[1]

It is also well-established that if charges are brought within the applicable statute of

limitations, a defendant has no basis for maintaining a claim of possible pre-indictment delay.

*Toussie v. United States*, 397 U.S. 112, 114-15 (1970); *see also Marion*, 404 U.S. 322. As the

*Marion* Court observed, "there is no need to press the Sixth Amendment into service to guard

against the mere possibility that pre-accusation delays will prejudice the defense in a criminal case

since the statute of limitations already performs that function." 404 U.S. at 323; *see also United

States v. Harrison*, 918 F.2d 469, 473 (5th Cir. 1990) (applicable statutes of limitation are primary

guarantee against overly stale criminal charges); *United States v. Pollack*, 534 F.2d 964, 969 (D.C.

Cir. 1976). In this case, the defendant was indicted within the 5-year statute of limitations for both

18 U.S.C. § 2252(a)(2) and §§ 981(a)(1)(C) and 2253. As a result, he cannot maintain a credible

claim of prejudice under the Sixth Amendment for the time elapsed between committing the

---

[1] Starting the speedy trial clock at the time the arrest warrant issues could create a perverse incentive for a foreign fugitive to manufacture a flight to the United States, spurring a prosecutor to obtain a warrant, only to delay his actual return until a moment when he believes he is best positioned to assert a violation of his speedy trial rights.

charged offenses and his indictment in the District of Columbia. The appropriate starting point for assessing his speedy trial claim is the date of the indictment – March 14, 2019.

## II.    The Defendant Fails to Establish a Right to Dismissal Based Upon Any Post-Indictment Delay.

In order to determine whether post-indictment delay constitutes a speedy trial violation, courts apply the balancing test set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972), as reiterated in *Doggett v. United States*, 505 U.S. 647, 651 (1992). This test focuses on four factors: 1) whether the delay before trial was uncommonly long; 2) whether the government or the defendant is more to blame for that delay; 3) whether, in due course, the defendant asserted his right to a speedy trial; and 4) whether he suffered prejudice as the delay's result. *Doggett*, 505 U.S. at 651, *citing Barker*, 407 U.S. at 530; *see also Tchibassa*, 452 F.3d at 922. As outlined below, an analysis of these factors plainly shows that there has been no violation of the defendant's speedy trial right in the present case.

### 1.  *Whether the delay before trial was uncommonly long*

In the present case, approximately 29 months passed between the defendant's indictment and his initial appearance in D.C. District Court. The defendant cites to *Doggett* for the proposition that "the lower courts have generally found post-accusation delay 'presumptively prejudicial' as it approaches one year." Def. Mot. at 5. However, this delay is merely the starting point for assessing an individual's speedy trial claim; once a defendant makes this "threshold showing" of presumptively prejudicial delay, analysis under the *Barker* balancing test outlined above is accordingly triggered. *Tchibassa*, 452 F.3d at 923. The court must then consider, "as one factor among several," the extent to which the delay stretches *beyond* the bare minimum needed to trigger judicial examination of the claim. *Id.*

Here, the 29-month delay remains much shorter than others that the D.C. Circuit has upheld against speedy trial challenges. *See, e.g., Tchibassa*, 452 F.3d 918 (delay of nearly eleven years); *United States v. Lopesierra-Gutierrez*, 708 F.3d 193, 202-03 (D.C. 2013) (delay of three-and-a-half years). Moreover, "the Court must consider the magnitude of the delay in the relevant context." *United States v. Demirtas*, 204 F. Supp. 3d 158, 171 (D.D.C. 2016). Not only has the prosecution of this case involved two countries, requiring two MLAT requests and an extradition request for the defendant, but part of Israel's evaluation of the government's extradition request occurred during the height of the covid-19 pandemic. Given these circumstances, the delay in this case cannot be considered "uncommonly long." *Doggett*, 505 U.S. at 651; *see also Barker*, 407 U.S. at 531 (noting that "the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge").

2.  *The reason and responsibility for the delay*

Turning to the second *Barker* factor, courts have repeatedly distinguished between a <u>deliberate</u> attempt by the government to delay a trial, which should be weighted heavily against the government, versus a <u>valid reason</u> justifying appropriate delay. *Barker*, 407 U.S. at 531. It is the government's burden to show that it pursued the defendant "with reasonable diligence from his indictment to his arrest." *Doggett*, 505 U.S. at 656. "[W]here a defendant is located abroad, . . . the hallmark of government diligence is extradition." *United States v. Fernandes*, 618 F. Supp. 2d 62, 69 (D.D.C 2009). If "the United States has a valid extradition treaty in place with a foreign country and prosecutors formally seek extradition . . . , courts routinely hold that the government has satisfied its diligence obligation." *Id.* (*citing Tchibassa*, 452 F.3d at 925).

In the present case, it is clear from the attached Olson Declaration that the government acted with due diligence in seeking the arrest of the defendant pursuant to the indictment. The U.S.

Attorney's Office sent OIA a draft extradition request less than *two weeks* after indictment. As detailed in the declaration, over the next four months, OIA worked with the U.S. Attorney's Office to finalize the extradition package, exchanging multiple drafts of the required affidavits and gathering other documents necessary for the finalized extradition package, including documents concerning the identity, nationality, and location of the defendant, a summary of the facts and procedural history of the case, the relevant text of the statutory offenses and the possible punishment thereof, and any other evidence necessary to justify the defendant's committal for trial under the laws of Israel, as well as a copy of the arrest warrant, and charging document. After additional review and certification by the U.S. Department of State, the extradition package was submitted to the Israeli authorities on September 19, 2019, approximately six months after the defendant's indictment.

Moreover, the government worked assiduously to gather the additional information requested by Israel after the initial submission of the extradition package. Between December 2019 and June 2020, OIA and the U.S. Attorney's Office worked together to try to ascertain the answers to Israel's questions, which included issues related to other jurisdictions. On or about June 12, 2020, after discussing these requests with the U.S. Attorney's Office, OIA responded to Israel's inquiries. Approximately ten months later, on April 19, 2021, Israel sought further information concerning the defendant's criminal history in the United States, including the specific facts related to defendant's prior conviction for a sex offense in the state of California. Before the United States responded, the defendant voluntarily returned to the United States on or about July 22, 2021, and was arrested, as discussed *supra*.

Thus, it is clear from the timeline reflected in the Olson Declaration that the United States acted with reasonable diligence in seeking to extradite the defendant: immediately after the

indictment, the government worked with OIA to prepare and submit the extradition package to Israel; moreover, when Israel requested additional information relating to the defendant's actions in other jurisdictions, the government gathered and provided that material to the Israeli authorities. Moreover, the time required for the foreign country to process an extradition request is not held against the requesting government.[2]

In sum, by promptly seeking the defendant's extradition, the government "satisfied its due diligence obligation." *Fernandes*, 618 F. Supp. 2d at 69. Consequently, the reason for any post-indictment delay in this case does not weigh against the government.

### 3. *The defendant's assertion of his speedy trial right*

The third *Barker* factor—the defendant's assertion of the speedy trial right—is often intertwined with the second factor—who is "more to blame for the delay." *Demirtas*, 204 F. Supp. 3d at 192 (*citing Doggett*, 505 U.S. at 651). "If a defendant is aware of the charges and becomes a fugitive, concealing his whereabouts from the government, he is generally charged with fault for the delay, as well as with failure to assert his right to a speedy trial. In contrast, a defendant cannot be blamed for a failure to assert his right to a speedy trial until he knows of the charges against him." *Id.* (internal citations omitted).

---

[2] *See, e.g.*, *United States v. Vazquez–Uribe,* 426 F. App'x 131, 137–38 (3d Cir. 2011) (concluding, in case involving 6–year delay between indictment and extradition, that second *Barker* factor did not favor defendant because "delay was principally a function of the different factions that were involved" and that "the [United States] government assiduously collaborated with foreign and multinational law enforcement agencies in its efforts to locate" the defendant); *United States v. Reumayr*, 530 F. Supp. 2d 1200, 1205-08 (D.N.M. 2007) (six-and-a-half year extradition litigation delay in Canada is attributable to the fugitive, not to the government); *United States v. Lawrence*, Criminal No. 4:03-00436-1, 2013 WL 6388455, at *4 (S.D. Tex. Dec. 6, 2013) ("The vast majority of the delay was created by Lawrence himself or was a function of the Nigerian legal process, matters over which the United States had no control.").

In the present case, the defendant claims that he asserted his constitutional speedy trial right at his initial appearance in D.C. District Court on August 26, 2021.[3] However, the defendant subsequently consented to multiple continuances in this case and corresponding exclusions of time under the statutory Speedy Trial Act, prior to filing the pending motion to dismiss. *See Barker*, 407 U.S. at 529 (requiring the court to "weigh the frequency and force of the [defendant's] objections to delay"). Moreover, the lead Israeli investigator's statements to the U.S. case agent in August 2016 about the defendant's inquiry regarding travel to the United States – and the defendant's subsequent failure to board his booked flight – at the very least suggests that the defendant was aware of the possibility of U.S. charges against him and actively attempted to avoid them. Thus, this factor does not significantly assist the defendant's claim.

4. *The prejudice suffered by the defendant*

Under the fourth *Barker* factor – prejudice – courts consider three kinds of prejudice that result from delay between formal accusation and trial: 1) oppressive pretrial incarceration; 2) anxiety and concern of the accused;  and 3) the possibility that the defendant's defense "will be impaired by dimming memories and loss of exculpatory evidence." *Doggett*, 505 U.S. at 654.

The first two categories of prejudice are inapplicable to the present case. With respect to the third category – impairment of the defense – the defendant does not identify any specific prejudice that he has suffered as a result of the delay in this case. Instead, he cites to language from *Doggett* that "excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify." Def. Mot. at 7. However, the *Doggett* Court

---

[3] The docket entry for this hearing does not reflect any discussion of the defendant's speedy trial rights; however, the government has no information contradicting the defendant's claim that he asserted his right at this hearing.

also recognized that 1) such presumptive prejudice cannot alone carry a Sixth Amendment claim without regard to the other *Barker* criteria; and 2) if the government has acted with reasonable diligence from indictment to arrest, a defendant's speedy trial claim must fail, however great the delay, if the defendant cannot show specific prejudice. 505 U.S. at 657.

Here, as detailed above, the government acted with diligence in seeking the defendant's arrest through extradition. The defendant's failure to identify any specific prejudice thus weighs heavily against him. Moreover, given that the charges pursued by the United States in this case stem from the same conduct investigated by the Israeli authorities – which the defendant was certainly aware of – the likelihood of impairment to the defense due to "dimming memories and the loss of exculpatory evidence" is extremely low. Indeed, given the specific allegations in this case, it is hard to imagine what such impairment could possibly look like: the defendant's interview with Israeli investigators was recorded, his communications with the UC are memorialized, and the extractions from his cell phone are in the custody of the United States. Thus, given both the government's diligence and the unlikelihood of any potential prejudice to the defense, the fourth *Barker* factor weighs strongly in favor of the government.

5. *Balancing the factors*

In sum, although the 29-month delay between indictment and the defendant's arraignment is longer than the one-year period considered to be "presumptively prejudicial," the delay reflects the more complicated nature of this international case. Importantly, the delay was not the result of any bad faith or negligence on the part of the government; to the contrary, the government acted with due diligence in seeking the defendant's extradition from Israel post-indictment. Moreover, the defendant has not identified any prejudice to his defense as a result of the delay. Thus, the

*Barker* factors tilt heavily in favor of the government. Accordingly, there has been no violation of the defendant's constitutional speedy trial right in this case.

## CONCLUSION

For the foregoing reasons, the government respectfully respects that the defendant's motion to dismiss the indictment for violation of his constitutional right to speedy trial be denied.

Respectfully submitted,

MATTHEW GRAVES
UNITED STATES ATTORNEY

*/s/ Caroline Burrell*
Caroline Burrell
Assistant United States Attorney
Federal Major Crimes
601 D. St N.W.
Washington, D.C. 20530
(202) 252-6950
caroline.burrell@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that the government's opposition was duly served upon the defense counsel Mary Petras, Esq., by electronic means via the Court's ECF system.

This 22nd day of April, 2022.

_/s/ Caroline Burrell_
AUSA Caroline Burrell

# EXHIBIT 1

# DECLARATION OF JONATHAN OLSON, ASSOCIATE DIRECTOR, OFFICE OF INTERNATIONAL AFFAIRS

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | Criminal No. 19-CR-100 (BAH) |
| NIMROD SHALOM, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DECLARATION OF JEFFREY M. OLSON
IN SUPPORT OF GOVERNMENT'S OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS**

Pursuant to Title 28, United States Code, Section 1746, I, Jeffrey M. Olson, declare under penalty of perjury that the following is true and correct:

1.     I am an Associate Director at the Office of International Affairs ("OIA") of the Criminal Division of the United States Department of Justice ("DOJ"), a position which I have held since 2010. I joined OIA initially as a Trial Attorney in 2001.

2.     OIA is the specific component of the Criminal Division of DOJ responsible for international extraditions. Thus, among other responsibilities, OIA plays a central role in securing the return of fugitives from abroad to face prosecution in the United States.

3.     OIA is generally divided into teams, some of which are responsible for working on specific countries or geographical regions. The OIA attorneys assigned to a particular country or collection of countries handle, among other things, all requests for extradition for that country. This practice permits OIA attorneys to develop familiarity with the foreign legal practices governing extradition requests between the United States and certain countries, and the relevant treaties and conventions with, and laws of those countries.

1

4.      As an Associate Director at OIA, I supervise a group of attorneys and International Affairs Specialists ("IASs") who review, monitor, and facilitate the execution of extradition requests to and from foreign countries.  From 2013 onward, I have supervised a team of attorneys and IASs at OIA who cover over 100 countries in Africa, Asia, and the Middle East, including Israel.  As the Associate Director at OIA responsible for overseeing matters with Israel, I have worked on and overseen dozens of extradition-related matters involving that country.

5.      I submit this declaration in support of the United States' opposition to the defendant's Motion to Dismiss in United States of America v. Nimrod Shalom, Case No. 19-cr-0100 (D.D.C.).  In preparing this declaration, I have relied on my personal knowledge, training, and experience.  I have also reviewed the file for this case and am generally familiar with the dates and events relevant to this matter.  The chronology set forth in this declaration does not constitute the entire chronology in this matter; it highlights those events in which OIA was involved and which are most relevant to responding to the defendant's motion.

### Overview of the Extradition Process with Israel

6.      The United States and Israel are parties to a bilateral extradition treaty, the Convention on Extradition Between the Government of the United States of America and the Government of the State of Israel, U.S.-Isr., Dec. 10, 1962, 14 U.S.T. 1707, *as amended by* the Protocol Between the Government of the United States and the Government of the State of Israel Amending the Convention on Extradition Signed at Washington, D.C. on December 10, 1962, U.S.-Isr., July 6, 2005, S. Treaty Doc. No. 109-3 (2005) (collectively, the "Treaty").

7.      The United States' process for submitting extradition requests to Israel is similar to that which it follows for requesting extradition from many other countries.  The process

involves close coordination between the local U.S. Attorney's Office ("USAO"), OIA, the U.S. Department of State, and the U.S. Embassy in Jerusalem, Israel.

8.     The first step in the process is for the local USAO to send a package of materials to OIA for proposed inclusion in an extradition request. Once OIA receives this package, the OIA attorney on my team responsible for handling matters with Israel reviews the request for, among other things, legal sufficiency to meet the requirements of the Treaty and of Israeli law, in accordance with the Treaty. OIA provides edits and comments to the USAO on the extradition package, and the USAO revises the extradition package accordingly.

9.     Once the extradition package is finalized, OIA follows a formal certification and seal process to establish the authenticity of the documents supporting the extradition request.

10.     Once the certification process is complete, the extradition package is submitted to the Department of State, which undertakes its own review of the package, adds its own certification, and prepares a cable to the U.S. Embassy, directing the preparation of a diplomatic note requesting extradition. The Department of State then sends the extradition package to the U.S. Embassy in Jerusalem, Israel, which presents the package to the Israeli government under cover of the diplomatic note.

11.     Generally, an extradition request is routed through Israel's Ministry of Foreign Affairs to its Ministry of Justice, Office of the State Attorney, Department of International Affairs, which serves as OIA's point of contact for the request. The extradition request is assigned to an attorney in the Department of International Affairs who reviews the request and, if it is deemed sufficient, will represent the United States in the extradition proceedings before Israeli courts. The Israeli attorney may also seek further information in support of the request, which may delay its execution.

**Request for the Extradition of Defendant**

12.    The United States followed the above-described process in seeking the extradition of Nimrod Shalom ("defendant") pursuant to, and in compliance with, the Treaty.

13.    On March 14, 2019, a federal grand jury returned an Indictment, charging the defendant with the following two offenses: [1] distribution of child pornography, in violation of 18 U.S.C. § 2252(a)(2); and [2] production or use of sexually explicit depictions of a minor for importation into the United States, in violation of 18 U.S.C. § 2260(b).

14.    On March 23, 2019, the Assistant United States Attorney (AUSA) then-assigned to this matter sent a draft extradition request to OIA.  OIA provided feedback and edits on the draft request and discussed with the AUSA the possibility of obtaining additional information to support the request.  Thereafter, OIA and the AUSA worked together to finalize the request for defendant's extradition, exchanging multiple drafts of the affidavit and other documents necessary for the extradition package, as required by Article X of the Treaty.  This provision requires that the United States submit documents including a description of the person sought, a statement of the facts, the relevant text of the laws charged and the possible punishment thereof, and any other evidence necessary to justify the fugitive's arrest under the laws of Israel, as well as a copy of the arrest warrant.  The United States typically establishes the required information through a prosecutor's affidavit and/or an affidavit from a case agent.

15.    OIA received the final package, including executed affidavits, from the AUSA on or about July 30, 2019.

16.    After completing its certification process, on or about August 2, 2019, OIA sent the extradition package to the Department of State.  On or about September 6, 2019, after

4

completing its own review and certification process, the Department of State sent a cable to the U.S. Embassy in Jerusalem, requesting a diplomatic note for the extradition package.

17.    On or about September 19, 2019, the Department of State informed OIA that the extradition package had been delivered to Israeli authorities.

18.    On or about December 12, 2019, the attorney with Israel's Department of International Affairs who reviewed the extradition request sought additional information concerning un-charged conduct that occurred outside of the District of Columbia. Between December 2019 and June 2020, OIA and the USAO worked together to try to ascertain the responses for information to Israel's questions, which included issues related to other jurisdictions. On or about June 12, 2020, after discussing these requests with the AUSA, OIA responded to Israel's inquiries.

19.    On April 19, 2021, Israel sought further information concerning the defendant's criminal history in the United States, including the specific facts related to defendant's prior conviction for a sex offense in the state of California.

20.    Before the United States responded, the defendant voluntarily returned to the United States on or about July 22, 2021, and was arrested when he landed in Los Angeles, California on July 23, 2021.

21.    It is my understanding that Israel never initiated the judicial proceedings necessary to effectuate the defendant's extradition, nor did Israel arrest the defendant pursuant to the United States' extradition request, as the case remained under review by the assigned attorney in Israel's Department of International Affairs until the extradition request was mooted by the defendant's return to the United States.

5

I declare under penalty of perjury that the foregoing is true and correct to my personal knowledge, information, and belief.

Executed on April 21, 2022.

Jeffrey M. Olson
Associate Director
Office of International Affairs
Criminal Division
United States Department of Justice

6